Our first case this morning is Lilly v. Zenith Goldline. Mr. Medlick. Initially, I would like to simply note that with respect to our appeal from the Inequitable Act, it is our intention to handle that during our rebuttal and to focus the opening ten minutes on the other issues. The issue before the court, first issue that we want to address, of course, is the anticipation issue. The issue is certainly not what is explicitly shown or stated or expressed in the Chakrabarty 1988 reference. Well, then, why are we talking about anticipation if there is no express showing of each and every feature of the claimed invention in a single reference? Your Honor, if an express showing were required, we wouldn't have cases such as Petering, Schaumann, the principles of which have been reaffirmed by this Court as recently as two weeks ago in the Adafina v. Great Lakes case and earlier than that in the Bristol-Myers v. Benvenute decision. We are entitled to look to what one of skill in the art would envision when he or she reads the reference. And here, it's important to note that one of skill in the art is not a lawyer, a judge, even a patent examiner. How many compounds are envisioned within the Chakrabarty article? How many in total? How many in total, yes. Your Honor, that's a question that I don't know. Yeah, I know. I read 45, 58, 75, or thousands. And you're telling me there's anticipation here? What I'm telling you, Your Honor, is if we follow the Petering analysis and apply it to the Chakrabarty reference, an even more compelling case for envisionment by those skills in the art is presented. We have in the Chakrabarty reference a broad statement of a genus contrary to what the contradicting itself by acknowledging that there is indeed a family of compounds. If we look in the reference itself, there is a figure with Rs and R1s and R2s and a table that tabulates different substitutions. We also have, as in the Petering case in the Cower patent specifically, which was the prior art there, we have something that focuses the attention of the reader of one's skills in the art to something more manageable. Yes, if we look at the broad genus, it could literally be an infinite number of compounds. It could be thousands. But we do have something that focuses the attention precisely as in Petering. In Petering, it was six examples which expressly disclosed eight compounds. No particular statement that the compounds were good, bad, or indifferent. Those were the eight that were chosen. It focused the attention of the reader. And again, it's important to note, the reader here is a Ph.D. medicinal chemist. What would focus your attention to Heffel and Lanzapin? In this case, Your Honor, we submit that what focuses your attention is, if you go from the broad genus disclosed in the Chakrabarty reference, then there are 45 particular compounds that are tested, and then there are five that are singled out as preferred. In Petering, the CCPA took the eight compounds and tabulated the substitution pattern that you arrive at. There was nothing in the CARA patent to identify a particular substitution pattern. The Court did it and used that as a vehicle to determine what does one skilled in the art see. Here, if you take the five compounds and realize that that provides a focused, smaller, more manageable group to look at and engage in the same exercise, you get the tables that we have produced on pages 19 and 20 of our opening brief. Once you have that, you come up with 18 compounds. Now, interestingly, of the 18 compounds, 11 of them, 11 are expressly identified in the reference. The five preferred, and then there are another six that are there. It requires only one to, excuse me, I have that, I have that backwards. There are seven that are expressly there. It requires you to envision only another 11. Again, we submit, when you are talking about a Ph.D. chemist, he is going to see those compounds just as surely as if they are expressed in name. That is, of course, the words of the CCPA in the Schaumann case. He will envision them, the entire subgenus, just as surely as if they are identified by name. Mr. Malik, I would have thought that you would really focus on the obviousness argument. I mean, the five, am I correct that the five Chakrabarti compounds are, if you look at 22, 702, and 703 of the, excuse me, of the joint appendix, are 9, 12, 7, 29, and 34. Those are the preferred ones? They are what are referred to as the preferred compounds, yes, Your Honor. Now, the one that is, I mean, it seems that 9, 12, 17, and 29 all are marked by a presence of fluorine. I am probably maybe not saying this in the chemical way properly, so bear with me on that. Now, 34 is different. Compound 34, the last of the five preferreds, seems to be different. How does compound 34 match up with olanzapine or ethylolanzapine? How does it match up with it in terms of going from one to the other? Well, Your Honor, to go from one to the other, in that particular instance, you would have to make two substitutions. Our argument is not that compound 34 is the closest prior art from which the obvious analysis should be judged. Oh, no. I understand that. No, I appreciate that. The reason I was asking is that, I mean, it seemed that in the Chakrabarti article, it is indicated that halogens with fluorine show some enhanced activity. And I noted that of the four of the five preferred compounds in Chakrabarti, four of them, the first four all have fluorine in them. And I was wondering, what, if anything, was meaningful about 34? Because the thrust, I mean, I think what Judge Young was saying is that Chakrabarti would teach away from starting with ethylolanzapine on an obviousness analysis and then going to olanzapine because he's saying, you know, these have all got fluorine in them. But then you have this 34 that didn't. So I was, I apologize for being sort of roundabout in thinking out loud with you. I think if I may, focusing attention on compound 34 really suggests the obviousness analysis that we've done with respect to flumezapine. It's the more appropriate analysis if you're going to look at the fluorinated compound. How do you get around the unexpected results? Excuse me? How do you get around the extensive analysis of secondary considerations, even if you do engage in a bit of a stretch to get to a prima facie case of obviousness? Well, Your Honor, with respect to flumezapine, which I'll dispose of quickly, there is no unexpected result. And even the court, the district court, acknowledged that flumezapine would be a place to start. The only unexpected result that was argued was elevated liver enzymes, and the court basically found that the assertion made in Lilly's IDS, information disclosure statement to the patent office, to the extent that there, to the effect that there was an unexpected superiority of olanzapine over flumezapine, turned out to be untrue. As to the more focused inquiry of the secondary indicia, Your Honor, as it relates to obviousness over compound 222, if we weigh what's there, and again, we submit that what needs to be weighed, the factors favoring obviousness and the factors favoring non-obviousness here. I would respectfully disagree with Your Honor that we have to stretch to get to structural obviousness here. Lilly conceded it at the patent office. Lilly itself, when it submitted its application, acknowledged that compound 222 is the closest prior art, in that it was the next adjacent homologue. We have the unbanked decision of this court in Dillon, which tells us that when you've got such close compounds, you would expect a next adjacent homologue relying on the CCPA decision in Pappish to result in similar properties. We don't need absolute predictability, but we need a reasonable expectation that the properties would be similar, not better than. So if we begin with a compound which is so closely related to olanzapine, namely compound 222, acknowledged to be so by Lilly itself, that's on one side of the ledger. All Lilly has, when you toll up everything, is the so-called cholesterol evidence. That's really what the case turned on as far as unexpected results. And what exactly is that evidence? That evidence, which also turns out to be something less than the patent office considered it to be, is simply that test showed that in female beagle dogs, given some 20 times the projected human therapeutic dose, it was noticed that cholesterol was elevated with ethyl olanzapine, compound 222, as contrasted with olanzapine. The district court expressly found that to the extent Dr. Scruby's declaration suggested that that result was extrapolatable to humans, it was misleading. Now the court doesn't need to decide whether that is intentional or not to realize, pursuant for example to the court's decision in the Syntex v. Apotex case, that the premise for which this patent was allowed had its legs cut out from under it. That evidence should be given such minimal weight, it cannot be said to apply to a significant aspect of the invention, particularly when we realize that cholesterol was one of close to 50, close to 50 toxicity tests that were done, and several, several tests going to the pharmacological properties. That tells us that, and as to everyone but cholesterol, ethyl olanzapine fared at least as good, if not better. If by happenstance, Your Honor, ethyl olanzapine was not the one that was formulated and that could have happened, if it was olanzapine that came first, we'd be arguing here about a patent on ethyl olanzapine, and we'd be hearing about the better results and the unexpected results of bilirubin and albumin and erythrocyte count, all suggesting the unexpected superiority of ethyl olanzapine over olanzapine. So, that's all the unexpected results get you here, is one little factor on Lilly's side of the scale to be contrasted with the overwhelming similarity of the molecules. Then we have, again, then you go to flumezapine, how close they are, one substitution away. Lilly's own acknowledgment that these are so close, that these are the closest prior art that needed to be overcome. I see that I'm probably into my rebuttal time already, Your Honor. Thank you, Mr. Hennepin. One question, if ethyl olanzapine, that's off patent right now. I'm sorry? Ethyl olanzapine is off patent. The patent covering it is no longer effective, isn't it? It's expired? The underlying patent, I believe, has expired, yes. So, why not use that as a molecule for antipsychotic drugs? Well, to do that, Your Honor, that would somewhat defeat the entire purpose of the Hatch-Waxman Act. We'd have to go file an NDA and do all the studies that are necessary. Hatch-Waxman allows us to work with what's on the market for which an NDA is ordered and filed. Presumably, nothing would stop anybody from doing that. But, interestingly, Your Honor, for the 20 or so years that the underlying patent was available, Lilly now tries to denigrate their own patent as the literature of failure. It was out there protecting this entire class of molecules and preventing people from doing any meaningful work with it. Well, olanzapine was essentially disclosed in that as one of the species, wasn't it? We certainly agree with that. It was admittedly covered by the claim. Okay. Thank you, Mr. Mendelick. Thank you, Your Honor. Mr. Lipsy? May it please the Court, the problem with the anticipation analysis which Zenith has advocated is it asks this Court to make a factual finding regarding what would be envisioned in the mind of a person of ordinary skill in the art reading Jack Robardi, 1988, without also considering all the other information that's also in the head of that person when that person reads the article. That article, by its terms, is addressed to the search for a safe atypical antipsychotic drug. The trial court here made extensive findings about what people engaged in that search knew and, more importantly, didn't know. The evidence showed that the cause of schizophrenia was unknown. There was no animal model of the disease. While you could test for the myriad properties known to adhere in clozapine, nobody knew which combination of those was responsible for atypical efficacy. No one knew which combination was responsible for toxicity. The crude animal tests, which is all that's disclosed there, were not predictive of atypical efficacy in man. They were only indicative of potential antipsychotic activity. Many compounds that had been identified with those tests, in fact, had failed in the clinic. People knew that safe atypical antipsychotic efficacy could really only be established by testing in actual schizophrenic patients. What about the five preferred compounds that were disclosed by Chuck Boyd? Of those five, the four had a halogen atom, an electron withdrawing what the prior art called neuroleptic substituent. The fifth had a hydroxyethyl group, and while little was known about structure activity relationships in this area, two things were known. Those two groups had acquired a special status in the art. The neuroleptic substituent was believed to be important to antipsychotic activity, and you saw it on all of the compounds that were put forward as potential replacements for clozapine. The hydroxyethyl in the trial court made a finding right on this, was known to enhance antipsychotic potency by improving penetration into the brain. So when a person of ordinary skill in the art, with everything that that person knows in his head, reads Jacobartian and sees a description of five compounds, four with the art-recognized neuroleptic substituent, one with the art-recognized hydroxyethyl substituent, the trial court found as a fact that that person would not immediately envision a compound like elanzapine that has neither one. And that finding of fact is not clearly erroneous, and it disposes of the anticipation contention on appeal. What about Trucabartian No. 6, which was also a high-activity type of a compound? It was not. That's exactly the point, Your Honor. It wasn't a high-activity compound. Compound 6 did not have the CAR score of 3, which was the minimal activity that was proven at trial to be necessary for identification. It had a 2 on it, though, right? It had a 2. And it was found to be inadequate. Compounds with a 2 were not identified as preferred in any of the Jacobartian writings. Clozapine had an activity of 3, and it was only compounds with an activity of 3 or 4 that were considered for further development. So that analysis actually disposes, and if I may, compound 6 was specifically not one of the ones called out as preferred. So when you look at the… It was not one of the five. Not one of the five. But it was listed. It was listed along with 45 other individual compounds. It had marginal activity. It had marginal activity. But it was not low activity. It was marginal. It was one point removed from activity. Well, a miss is as good as a mile, as my old grandmother used to say, Your Honor. It was not sufficiently active to be a potential candidate for development as a safe atypical antipsychotic drug. Now, one thing that was said in the opening, there is no generic disclosure in Jacobarty that encompasses olanzapine the way there was in the formula in Petering and in Schaumann. We've dealt with that in our brief. It simply isn't there. Now, that same analysis, that same extensive factual finding the trial court made about what's actually in the head of people of ordinary skill in the art also disposes of the obviousness argument the trial court found as a fact that there was no legitimate motivation to start with compound 2, 2, 2 that had an inadequate CAR score of only 2 and lacked the neuroleptic substituent as a development candidate in the first place. Is that one? In part, is that because of the first four of the five preferred compounds all have the fluorine orientation, correct? Correct. And the ethyl olanzapine does not. Does not. Nor does it have the hydroxyethyl group that was on the fifth that also was recognized in the art as improving potency. That's exactly the point. They try to say that compound 36 or 34, whatever the number was, showed that hydrogen was preferred. It showed no such thing. It showed that hydroxyethyl was preferred. Why would compound 34 not point you to ethyl olanzapine? Because ethyl olanzapine didn't have the hydroxyethyl group on it either. Those compounds, ethyl olanzapine, compound 6, compound 2, 2, 2, whatever you want to call it, was an uninteresting backwater in Jack Ribardi in 1988 and became of interest only after Lilly later discovered that its adjacent homolog happened to be the solution to the search for a safe atypical antipsychotic drug. Now, again, the trial court found no motivation to start with 2, 2, 2, no legitimate motivation to modify it other than by putting a neuroleptic substituent or a hydroxyethyl group on it, no legitimate motivation to take the neuroleptic substituent off of flumesapine. That would have been going in exactly the opposite direction of the weight of authority in the art. Is that what the unobviousness type of a situation you're claiming? Is it the removal of the halogen? It was contraindicated by halogen. Halogen was to olanzapine because the rest of the structure is the same, isn't it? That's correct, but that was a hugely important component. No, but the rest of the structure is the same. The rest of the structure is the same, but that's like saying that the car without the engine and the car with the engine, the rest of the structure is the same. Well, that's not necessarily the case. Well, except the people skilled in the art, and the evidence here is overwhelming, perceived that neuroleptic substituent, like a halogen atom, to be hugely important in obtaining antipsychotic activity. And while it might have been obvious, arguably, to change it to some other electron-withdrawing component, it certainly would not have been obvious in the trial court so found to take it off and not replace it with any other neuroleptic substituent. And more importantly... What is the replacement in olanzapine then? They're both metal, right? No, but the fluorine is over on the other side of the molecule. It's over on the other side of the... And that, to get to olanzapine, first of all, you can't just take it off. You have to start with a whole new chemistry. But the molecule olanzapine doesn't have it there, and it doesn't have any other neuroleptic substituent in its place. And in that respect, that is in part why it was so unobvious. But they're both metal bases. They both have a metal substituent, but olanzapine does not have the neuroleptic substituent that everybody working in this field regarded as so important. And secondly, the court found there was no reasonable expectation of success in making either of these modifications. You ended up with a molecule that lacked the neuroleptic substituent or the hydroxyethyl, both of which were known to be important in making these molecules go. The art was highly, highly unpredictable. There were rafts of failures. And I think if you do nothing more than read the first paragraph of the Davis article, which is at page 1809 of the record, that will give you a feel for the degree of difficulty that people in this art were encountering in attempting to find a safe, atypical antipsychotic drug. Failure after failure after failure. And what was the source of the failure? It was posited not to be the fluorine atom, as Zenith contends. It was suggested that it was the heteroatom, the sulfur or the nitrogen that was in the ring system, that that perhaps was the problem. And if you changed that, you would never end up with olanzapine. Now, if you want to talk about properties, the evidence in the record shows, with respect to these compounds, exactly what people in this art already knew. Small structural changes in clozapine replacement-type molecules led to unpredictable and great changes in properties. For example, the record showed if you took ethyl flumazepine, it created all kinds of blood problems in dogs, but the adjacent homologue, the methyl compound flumazepine, didn't create those problems in dogs. The ethyl-substituted compound 2,2,2 in a garden-variety toxicology test, done at the doses that everybody at Lilly used for this class of compounds, showed a very large statistically significant increase in cholesterol in the female dogs at the 8 milligram dose, yet the methyl compound, one removed from it, did not. Small changes in structure lead to unpredictable changes in properties. And more significantly... Ethyl olanzapine, though, was disclosed in the 574 paper. It was not. It was one of the species. It was encompassed generically by the claim. It was encompassed broadly. It was not described. In fact, it hadn't even been made for years after that. In fact, there's a lot of talk about the 574 patent. The 574 patent is a statutory bar-printed publication in this case. Nothing more, nothing less. There is no double-patenting issue in this case. We're not talking about double-patenting. We're talking about obviousness. Correct. With respect to whether or not the ethyl olanzapine was already disclosed in the 574 patent. It was encompassed but not disclosed, not described. It could not have been claimed specifically in that patent because there was no description of that compound. But the genus covered it. The genus encompassed it, but that has long been the case. The genus claim covered the ethyl olanzapine. Correct. And as this Court held in Inouye-Baird, the fact that a compound may be encompassed by one of these very broad multimillion compound genuses in the prior art does not at all mean that it's obvious. Now, again, going back to properties, the properties that make olanzapine a safe atypical antipsychotic drug are hugely medically significant. They are highly unpredictable, as the pattern of failure reflected amply in the record shows, and they were long sought by many scientists working in this field. And that fact pattern has been found in cases such as Inouye-Baird and later in cases like Yamanuchi to be an unobvious patentable advance. Indeed, this compound is patentable here for the very same reasons that the discovery of nonaddictive analgesia in May was patentable. That property was highly significant, and it was in a highly unpredictable art area. And if you read May closely, you'll see that the adjacent homologue in the prior art there actually turned out to be a nonaddictive analgesic, albeit unknown to the art, still unobvious because it wasn't disclosed in the prior art as a nonaddictive analgesic. And here, notwithstanding everything you've heard and read in the briefs, compound 222 is not disclosed in the prior art as a safe atypical antipsychotic drug. The 574 patent doesn't say anything about atypical properties at all for any of those compounds. So let's see, where's the closest in the prior art that you come to an actual disclosure of compound 222, the ethyl olanzapine? Compound 222 is explicitly disclosed in the prior art in Jacobarty, 1988. But other than that? Our point on that is the only thing that would cause you to start with that as a point of departure is hindsight, is knowing later on that the methyl compound, in fact, was the solution. And while their reply brief is rife with hindsight, it's rife with reference to our invention and the thought processes of our inventors. That's all totally improper. There is no shortcut. The analysis is dictated by the statute. The test is in the statute. The analysis is dictated by Graham versus John Deere. The stuff on which the analysis is done is the complete trial record. And when you do the Graham analysis on the complete trial record and use the test in 103, nobody, people of ordinary skill in the art, as a matter of fact, would not have gone this direction. They would have gone some other direction. And those fact findings are not clearly released. Even if you start with the compound 222, it would not be obvious to go to the ethyl? The compound 222 had the ethyl group on it. It would not be obvious to go to the methyl? It would not be obvious to go to the methyl. First of all, what somebody of ordinary skill in the art actually would have done would have been to take that compound and put some kind of electron withdrawing substituent on it to try to improve the properties. Maybe not fluorine, maybe chlorine, maybe something else. And even if you went so far as to say you'd start with 222, there wasn't any suggestion in there that methyl would be better than ethyl for any purpose at all. And in fact, the only discussion in the article about short alkyl substitution is in two sentences that are dealing with the fluorine substituted series. There are seven compounds in those two sentences, eight if you count the unsubstituted compound that they're all compared to, and the only series that has all eight of those compounds is the fluorinated series. The trial court found as a fact that the person of ordinary skill in the art, knowing what they know, would read those two sentences as relating to fluorinated compounds and not compounds like compound 222 that were not. Now, again, to make the point, 222 is not disclosed in the prior art as a safe atypical antipsychotic drug. 574 says nothing about atypical properties. Jacobardi 1980 says that the compound lacks the sufficient minimal activity to be of interest. And the fact of the matter is the fact that there may be a handful of crude pharmacological tests that you can do on the compound where you get roughly equipotent results does not equate with atypical antipsychotic efficacy in humans. We saw from the myriad failures of compounds that people thought had antipsychotic efficacy based on animal tests that turned out not to. And, again, Dr. Paul testified about this. His testimony is in the appendix. Dr. Puller testified about it. Dr. Nichols testified about it. It's all right there. Those people would not perceive that compound as being an atypical antipsychotic drug. There is no evidence it's a safe atypical antipsychotic drug at any dose. We've dealt with all the other issues in our brief. The court has the trial court's opinion. The judge did a very careful and thorough job. And to offend J.C. Penney, Your Honor, it's all inside. Is that by weight or number of pages? Either. By any measure. Either. In this case. Thank you. Mr. Mendlik, you have a little more than three minutes remaining. First, the suggestion that there is no genus disclosed in the Chakrabarti 1988 reference is just wrong. There is a genus disclosed. The figure is there. It may not use the same patent parlance. But there's a figure. There are R groups. There's a genus as surely as there was in the Karakate. But isn't Mr. Lipsy right that there was nothing in the art that would have led you, if you want to start with flumezapine to make the hydrogen substitution or if you want to start with 2, 2, 2 to make the methyl substitution, in the first place, you wouldn't have started with either one of those. In the second place, there would have been nothing to cause you to make the substitution. Where is the suggestion first for the starting and second for the substitutions when everything seemed to be teaching exactly to the opposite as 221 pages of district court opinion pointed out? First of all, Your Honor, we maintain that, as we argued in our briefs, there is no requirement to find a particular place to start. The only support for that is one statement in the Amanuchi case, which was really a motivation to combine case when all told. There were bits and pieces from prior references. The only support for that is a Federal Circuit opinion. Those are kind of binding on us. Your Honor, the statement must be read in context of the facts of that case. This seems to me to be as close to Yamanuchi as anything I've read in five or six years since that case. Your Honor, the Yamanuchi decision certainly didn't purport to overrule such cases as Merck v. BioCraft, Mills, Bo, all cited on page 27 of our brief, that a prior art reference is not only available for a particular best disclosure as a starting point, even, for example, Merck v. BioCraft. But one of skill in the art has to be able to perceive that this drug is useful for this purpose so as to be motivated to make changes in it to reach the result in obviousness. And I don't see how one of skill in the art would perceive that any of these drugs are going the right direction or perceive that there's a suggestion to make an alteration to get there. Your Honor, in Dillon, which came after May, Dillon made it very clear that you don't need both a structural similarity and an expectation of similar properties. Here we really do have both. Much as Mr. Lipsy wants to run away from Lilly's 574 patent by trying to read into the claim limitations such as safe and effective atypical antipsychotic, they're not there. We have a compound claim. Accordingly, the disclosure in 574 itself, in Chakrabarti 1988 itself, that these compounds, this class of compounds which Chakrabarti tells us after saying that this is an example of five preferred, this class deserves further study. Now, that's enough motivation to take compounds that Lilly itself said were worthy of study, would be reasonably expected, not absolutely expected. They don't have to be the best. We don't have to establish for obviousness that there's an expectation that what we will get when we go down a particular path will be better than something else. Fulton tells us we can have more than one obvious substitution. Taking flumezepine, there's a clear motivation, the judge himself found it, in the Sullivan and Franklin article, to suggest that the fluorine itself might be causing toxicity problems. What better motivation than to just take it off? And if you take it off, Your Honor, you wind up with hydrogen. You don't have to substitute anything. And if you can, might you also consider obvious to substitute chlorine because of the disclosure? Sure, but that doesn't make hydrogen less obvious, particularly when you have a compound such as compound 34, which is one of the preferred, but not hydrogen. Sullivan and Frank aren't recommending any substitutions or changes. They're just reporting the use of flumezepine in dogs. And they're suggesting that the fluorine might be a problem, which would say to one skilled in the art, there's my motivation to get rid of it. And if I have a motivation to get rid of it, where am I going to wind up? Any final comments here? Given the time, of course, Your Honor, I have plenty, but under the circumstances, we'll rest. Thank you very much.